# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| FNB BANK, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>PARK NATIONAL CORPORATION, )<br>et al., )<br>)<br>Defendants. ) | CIVIL ACTION 13-0064-WS-C |

## ORDER

This matter is before the Court on the motion of defendant SE Property Holdings, LLC ("SEPH") for summary judgment and on the plaintiff's cross-motion for partial summary judgment. (Docs. 105, 117). The parties have submitted briefs and evidentiary materials in support of their respective positions, (Docs. 106-09, 118-21, 131, 133-34, 136-37, 153-55),[1] and the motions are ripe for resolution. After careful consideration, the Court concludes that both motions are due to be denied.

---

[1] The parties purport to "incorporate" all or portions of prior briefs on prior motions into their present briefs on the instant motions. By local rule, principal briefs cannot exceed 30 pages, and reply briefs cannot exceed 15 pages. Local Rule 7.1(b). The parties are fully aware of this rule, since SEPH sought leave to file a 34-page principal brief and the plaintiff sought leave to file a 19-page reply brief. (Docs. 135, 149). Neither sought leave to further exceed the page limits by incorporating previous briefing. "[W]hen a party incorporates by reference an entire section of another brief, … the incorporated section should count against" the page limits established by local rule. *Bryant v. Jones*, 2006 WL 584762 at *6 (N.D. Ga. 2006). The parties' tactic "is improper and foists upon the Court the burden of sifting through irrelevant materials to find the materials referenced while permitting the movant to circumvent this Court's page limit." *Mobile Shelter Systems USA, Inc. v. Grate Pallet Solutions, LLC*, 845 F. Supp. 2d 1241, 1253 (M.D. Fla. 2012). Like its sister courts, the Court "will not countenance any attempt to avoid the page limit requirement of the Local Rules." *Id.* The materials purportedly incorporated are not before the Court and will not be considered in resolving the instant motions.

# BACKGROUND

According to the second amended complaint, (Doc. 130), non-party Vision Bank ("Vision") made a $5 million loan ("the Loan") to non-party Marine Park, LLC ("Marine") for a real estate development project, secured by certain realty and guarantied by multiple guarantors.  In March 2007, Vision sold a 100% participation interest in the loan to the plaintiff, with the parties' obligations memorialized in a written agreement ("the Agreement").  Later the same month, Vision consummated a merger agreement with defendant Park National Corporation ("Park"), a bank holding company, and Vision became Park's subsidiary.  Park thereafter became closely involved in supervising Vision.  Over the next two years, Vision made a number of misstatements, repeatedly failed to disclose important information, and engaged in other conduct to which the plaintiff objects.  The Loan matured without payment in January 2009, and litigation with Marine and the guarantors is ongoing.

In February 2012, Park sold certain "good" assets of Vision to non-party Centennial Bank.  In February 2012, Park merged Vision into SEPH, a wholly owned subsidiary of Park, and Vision ceased to exist.  Among the "bad" assets retained by Vision and transferred to SEPH was the Loan.

In January 2013, the plaintiff sent the defendants a letter identifying multiple defaults under the Agreement and demanding that the defaults be cured or its participation interest repurchased as provided for in the Agreement.  The defendants neither cured nor repurchased.

The four counts against the defendants assert the following:  (1) breach of contract; (2) negligence; (3) willful misconduct; and (4) specific performance. SEPH seeks summary judgment as to all claims; the plaintiff seeks summary judgment with respect to Counts One and Four.

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving

party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[2] Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited. Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

## I. Plaintiff's Motion for Partial Summary Judgment.

The second amended complaint lists thirteen ways in which the defendants and/or Vision allegedly breached the Agreement. (Doc. 130 at 20-21). The last of these is that the defendants "refus[ed] to repurchase FNB's participation interest pursuant to the terms of the Participation Agreement." (*Id*. at 21, ¶ 73.m). The

---

[2] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

plaintiff's motion is based on an alleged breach of this provision.  The plaintiff seeks summary judgment as to the portion of Count One that is based on a breach of the repurchase provision and as to the entirety of Count Four, which is based exclusively on such a breach.

> 13.  <u>Breach by Originating Bank</u>.  Participating Bank shall, in addition to all other remedies available to it at law or in equity, have the unilateral right (but not the obligation) to sell to Originating Bank, regardless of regulatory or self-imposed lending limits of Originating Bank, its Participation Interest for an amount equal to the aggregate of all principal, interest, fees and other sums due with respect to its Participation Interest, if:
>
> > a.  Originating Bank shall fail to cure any default by Originating Bank under this Agreement within thirty (30) days after notice from Participating Bank specifying the default; [or]
> > …
> > d.  Originating Bank shall (i) enter into any merger ….
>
> Participating Bank shall have the right to maintain an action for specific performance against Originating Bank to enforce Participating Bank's rights under this Section 13.

(Doc. 130, Exhibit A at 6-7, § 13).

The plaintiff asserts that the repurchase option was triggered under Section 13.d by Vision's 2012 merger with SEPH.  (Doc. 118 at 16-17).  The plaintiff asserts that the repurchase option was triggered under Section 13.a by:  (1) Vision's failure to provide prompt notice of two 2008 downgrades of the Loan; (2) Vision's failure to provide prompt notice of the circumstances leading to its 2007 loan to Marine's affiliate; and (3) Vision's failure to provide prompt notice of a personal business relationship between Vision officials and the manager of Marine.  (*Id*. at 17-23).  The plaintiff argues that Vision's refusal to repurchase its participation interest breached Section 13 and allows the plaintiff a remedy of specific performance of the repurchase obligation or an award of damages equal to the repurchase amount established by Section 13.  (*Id*. at 23-30).

SEPH denies that these events constituted breaches for purposes of Section 13. It also argues that Section 9 of the Agreement modifies Section 13 so as to require a "material breach" of the Agreement in order to trigger a repurchase option and that the alleged breaches do not attain this threshold. (Doc. 133 at 10-19). Should the option be triggered, SEPH argues that it cannot, for various reasons, be enforced by specific performance and that it cannot be enforced by an award of damages, both because that would constitute an impermissible penalty and because the plaintiff cannot show any actual damages as a predicate. (*Id*. at 24-34).

The Court need not consider any of these arguments in resolving the plaintiff's motion, because it finds another of SEPH's arguments to be dispositive. SEPH asserts that the plaintiff's resort to Section 13 is precluded by certain "non-recourse" provisions of the Agreement. In Section 1, Vision "sells … to [the plaintiff], without recourse, … an undivided interest in [Vision's] right, title and interest … in each loan comprising the Loan …." (Doc. 130, Exhibit A at 1, § 1). Section 14 provides as follows:

> 14. <u>Non-Recourse Sale</u>. By express agreement of [Vision] and [the plaintiff], the sale of the Participation Interest under this Agreement shall be on a "NON-RECOURSE" basis. Nothing contained in any other part of this Agreement shall change the agreement of the parties on this provision, or alter this provision.

(*Id*. at 7, § 14). According to SEPH, repurchase is recourse, such that Sections 1 and 14 preclude relief under Section 13.

Even though the matter is one of contract interpretation, neither side offers the Court any rule of construction for determining the meaning of "non-recourse." Instead, both sides rely exclusively on case law dealing with non-recourse provisions. (Doc. 133 at 19-24; Doc. 154 at 6-8). As the parties have chosen this as their means of construing the provision, the Court will do likewise.

Federal regulations formerly required that all sales of loans and participation interests by a savings association be made "without recourse," a term

defined in pertinent part to mean "'without any agreement or arrangement under which the purchaser is to be entitled to receive from the seller any sum of money or thing of value, whether tangible or intangible (including any substitution), upon default in payment of any loan or mortgage involved ....'" *Resolution Trust Corp. v. Home Savings of America*, 946 F.2d 93, 95 & n.2 (8th Cir. 1991) (quoting 12 C.F.R. § 561.8 (1980)). In *Home Savings*, the parties' predecessors entered a loan participation agreement as well as two side agreements, pursuant to which the originating entity agreed, in event of default on the underlying obligation, to repurchase the participation interest or to provide substitute loans. *Id*. at 94-95. The Eighth Circuit concluded that these agreements were "with recourse" because they preserved to the originating entity "the kind of contingent financial liability that the prohibition against sales with recourse was intended to prevent." *Id*. at 96. SEPH's argument emphasizes this opinion.

Federal banking regulations do not now require that transactions involving participation interests be without recourse, but they encourage the inclusion of such a provision. A loan participation agreement can constitute either a sale by the lead bank to the participating bank or a loan from the participating bank to the lead bank. *In re: Brooke Corp.*, 458 B.R. 579, 585 (Bankr. D. Kan. 2011).

> Where the participation agreement uses the words sale, transfer, or assignment, the transaction falls into the first category. Under regulations of the Comptroller of the Currency, a sale permits the lead lender to subtract a participated loan, to the extent of the participation, from its loans outstanding for lending limit restrictions *if the interests are sold without recourse* and the participation results in a pro rata sharing of the credit risk.

*Id*. at 585-86 (emphasis added) (describing 12 C.F.R. § 32.2 ). The regulations thus serve the salutary purpose of preventing an originating bank from avoiding its lending limit by keeping participation interests off its list of outstanding loans when it still is exposed to loss by non-payment on the participated portion of the underlying obligation.

The parties have provided the Court no reason to suspect that Sections 1 and 14 were included in the Agreement for any reason other than to satisfy these regulations. The Court therefore must construe these contractual provisions as precluding any arrangement that preserves Vision's contingent risk of non-payment on the participated portion of the underlying obligation. But, as *Home Savings* reflects, that is precisely what a repurchase provision does – it leaves the originating bank exposed to the risk of non-payment because it requires the originating bank to buy back the participated loan in certain situations, exposing the originating bank to a loss on the loan should the loan not perform.

For its part, the plaintiff relies on two cases in which suits by a participating bank against an originating bank were allowed to proceed despite a non-recourse provision.[3] In *People's Heritage Savings Bank v. Recoll Management, Inc.*, 814 F. Supp. 159 (D. Me. 1993), the seller of a loan participation interest claimed that the agreement's non-recourse provision precluded the buyer's suit for breaches of the agreement. The Court concluded that, "in its common usage, exemplified both by the legal dictionary and the language of the courts," the term "'nonrecourse' is implicitly limited … to disallowing recourse on the *underlying instrument*." *Id.* at 163 (emphasis in original). Thus, "the nonrecourse language … upon which Defendant relies applies only to *the underlying indebtedness*, not to the contractual and legal obligations regarding the servicing and collection of the loan specifically expressed in the Agreement." *Id.* (emphasis in original); *accord First Independent Bank v. Mohave State Bank*, 2010 WL 1408890 at *2 (D. Ariz. 2010) (relying on *Recoll*).

The "underlying indebtedness" referenced in *Recoll* is of course the participated portion of the loan, and *Recoll* confirms that a non-recourse provision precludes recourse on that underlying indebtedness. As noted above, a repurchase

---

[3] The plaintiff's other two cases are inapposite, both because they involved non-recourse provisions in loans rather than in sales and because they stand only for the proposition that a non-recourse provision in one agreement does not, without more, apply to a separate agreement containing no such provision.

option as to such an indebtedness is recourse because it leaves the seller exposed to the risk of non-payment on that indebtedness. *Recoll* and *Mohave* are thus perfectly consistent with *Home Savings*. It is true, as the plaintiff emphasizes, that the *Recoll* and *Mohave* Courts permitted those actions to proceed but, because the plaintiffs in those cases did not demand repurchase but sought only damages for contractual breaches, that result does not aid the plaintiff's position.

The plaintiff insists it "is not attempting to hold SEPH liable for the Borrower's default." (Doc. 154 at 7). But that is not the question. The question is whether repurchase would shift to SEPH the risk of loss on the underlying obligation. And the foregoing discussion demonstrates that it would do exactly that.

The plaintiff also insists it is "seeking the enforcement of obligations in the Participation Agreement that are independent of the underlying debt obligation." (Doc. 154 at 7). Perhaps the obligations of Vision giving rise to the repurchase option (disclosure, non-merger) are independent of the underlying debt obligation but, for reasons already stated, the repurchase obligation itself is *not* independent of the debt obligation.

The non-recourse provisions of Sections 1 and 14 are thus directly contrary to the repurchase provision of Section 13. Which should prevail? The Agreement answers that question directly. As SEPH stresses, Section 14 provides that "[n]othing contained in any other part of this Agreement shall change the agreement of the parties on this provision, or alter this provision." The plaintiff offers no argument that this clause is not determinative, instead clinging to the forlorn hope that there really is no inconsistency between the provisions. (Doc. 154 at 8). Because there is such an inconsistency, because the Agreement resolves the inconsistency in favor of Sections 1 and 14 and against Section 13, and because the plaintiff offers no challenge to the former provisions' supremacy in case of conflict, the Court concludes that Sections 1 and 14 eliminate any repurchase option granted by Section 13.

For the reasons set forth above, the plaintiff's motion for partial summary judgment is due to be denied.

## II. SEPH's Motion for Summary Judgment.

SEPH seeks summary judgment as to all four counts of the second amended complaint. The Court addresses them in turn.

### A. Breach of Contract.

As noted, the second amended complaint identifies thirteen ways in which the defendants and/or Vision allegedly breached the Agreement. (Doc. 130 at 20-21.) SEPH's primary arguments as to each are that its alleged conduct did not breach the Agreement and/or did not cause the plaintiff any damage.

#### 1. "Failing to keep [the plaintiff] apprised of additional loans made to the Guarantor(s)." (Doc. 130 at 20, ¶ 73.a).

Section 10 of the Agreement provides in pertinent part as follows:

> Originating Bank shall promptly, after Originating Bank's having knowledge thereof, inform Participating Bank of any circumstances (a "default") which in Originating Bank's reasonable judgment: (a) constitute a material default under the Loan Documents and of the salient facts known to Originating Bank concerning such default; or (b) could have a material, adverse affect [sic] on the Loan or the value of the Collateral securing the Loan.

(Doc. 130, Exhibit A at 5, § 10).

There is evidence that an entity known as Bama Bayou, LLC ("Bama Bayou") conceived a large, multi-use coastal development including condos, hotels, restaurants, convention center, retail space, water park and marine animal park. In order to qualify for a government financing guaranty, the latter portion was carved out of the larger project and became the responsibility of Marine. In September 2007, Vision lent Bama Bayou an additional $5 million, one purpose of which was provide funds to make interest payments on the Loan, even though

10

those interest payments were supposed to have been made from the guarantors' personal cash flow. The plaintiff funded over $1.5 million in construction draws between the time the second loan was made and when it was advised of that loan. (Doc. 118 at 4, ¶ 5; *id*. at 7, ¶¶ 18-19; *id*. at 19 n.5).

SEPH raises two related arguments why it could not have breached Section 10 by failing to promptly notify the plaintiff of the September 2007 loan.[4] First, SEPH suggests the term "material, adverse [e]ffect on the Loan" should be construed to exclude questions of collectability of the Loan, on the theory that, if the parties wanted the phrase to include such questions they would have said so explicitly. (Doc. 106 at 11). But SEPH offers no rule of construction for the implausible proposition that a general phrase does not encompass a specific matter that reasonably falls within the reach of the general phrase unless the contract also explicitly mentions the specific matter. As the plaintiff notes, (Doc. 136 at 8), the whole point of a loan, from the lender's perspective, is to have the loan repaid, with interest and on time. What could possibly have a more materially adverse effect on the loan than circumstances suggesting a diminished chance of it being collected? SEPH offers no answer.

Second, SEPH notes that the Agreement expressly obligated Vision to notify the plaintiff of "any future extensions of credit by [Vision] to the Borrower(s) other than under the Loan." (Doc. 130, Exhibit A at 8, ¶ 15.f). SEPH argues that, since Vision expressly agreed to notify the plaintiff of loans to Marine, the absence of an express promise to notify the plaintiff of loans to Marine's guarantors indicates that no such promise exists. (Doc. 106 at 11). But, as noted above, Section 10 encompasses just such an obligation, so long as the requirements of that provision are satisfied.

---

[4] SEPH withdrew its third argument after realizing it was based on the false premise that there was no cross-default provision in the Loan. (Doc. 106 at 11; Doc. 131 at 1).

In opposition to the plaintiff's motion for partial summary judgment, SEPH raises several additional challenges to this portion of Count One. (Doc. 13 at 15-17). There are problems with each of them, but the Court need not address them because they do not appear in SEPH's brief on its own motion for summary judgment and thus cannot be used to support summary judgment. The only statement therein worthy of note is SEPH's dispositive admission that "[t]here is a question of fact whether there was any breach at all …." (Doc. 133 at 16).

In summary, SEPH is not entitled to summary judgment as to this portion of Count One.

**2. "Entering into the acquisition and various mergers of Vision, including merger of Vision into SE Property."** (Doc. 130 at 20, ¶ 73.b).

The parties agree that this portion of Count One challenges three different mergers: (1) Vision's acquisition by Park in March 2007; (2) Vision's merger with another Vision entity in June 2007; and (3) Vision's merger with SEPH in February 2012.

SEPH first argues that the March 2007 merger took place shortly after the Agreement was entered and that the plaintiff, by entering the Agreement with knowledge of the impending merger, impliedly consented to the merger and waived any objection to it. (Doc. 106 at 11-12). As the plaintiff correctly notes, (Doc. 136 at 10-11), it has evidence that it did not know of the merger until well after it entered the Agreement. (Baggett Deposition I at 314, 555). Because this evidence must be credited on motion for summary judgment, and because it negates a necessary premise of SEPH's argument, SEPH is not entitled to summary judgment on this ground.

As to the other two mergers, SEPH argues that, assuming the mergers breached the Agreement, the plaintiff suffered no damage as a result.[5] SEPH says the June 2007 merger did not harm the plaintiff because: (1) it occurred over a

_____

[5] SEPH makes no similar argument with respect to the March 2007 merger.

year before the Loan went in default; (2) it did not result in any substantive changes in management or the persons administering the Loan; and (3) it ultimately strengthened the bank. It says the February 2012 merger did not harm the plaintiff because it occurred long after the Loan defaulted in December 2008. (Doc. 106 at 12-13).

To meet its burden on motion for summary judgment, SEPH must either negate the existence of damages from the mergers or point to materials on file that show the plaintiff cannot prove any damages from the mergers. *Clark,* 929 F.2d at 608. SEPH has done neither. As to the June 2007 merger, the mere fact it was entered well before default does not negate damage to the plaintiff flowing therefrom. That the relevant personnel remained in place may make it less likely that the merger caused damage but does not negate it. And SEPH's cited evidence does not reflect that the merger strengthened Vision, only that it was "inten[ded]" to do so. (DeLawder Affidavit, ¶ 12). None of this material demonstrates that the plaintiff cannot establish any damage from the merger.

As to the February 2012 merger, that it occurred post-default does negate damage in the form of the default itself, but it does not negate the existence of other damage the merger might have inflicted. Again, the timing of the merger vis-à-vis the default does not on its own demonstrate the plaintiff cannot establish any damage from the merger.

The plaintiff does not in its opposition indicate that it has ready proof of actual damages from any of the mergers but, in light of SEPH's failure to meet its initial burden, this is immaterial. *See Imaging Business Machines, LLC v. BancTec, Inc.,* 459 F.3d 1186, 1190 (11th Cir. 2006) ("[T]he defendant's initial burden is to show that a plaintiff lacks evidence regarding each injury alleged to be proximately caused by its wrong"; where the defendant "did not meet its initial burden on summary judgment[,] the burden never shifted to [the plaintiff] to offer evidence of its injury resulting from the alleged fraud"). While an admission by the plaintiff that it can prove no damage from the mergers would support summary

judgment despite SEPH's failure to meet its initial burden, the plaintiff offers no such admission. The plaintiff acknowledges that "specific damages resulting from the mergers cannot be *quantified*," (Doc. 136 at 10 (emphasis added)), but this falls short of an admission that specific damages from the mergers do not *exist*. SEPH makes no argument to the contrary.[6]

In summary, SEPH is not entitled to summary judgment as to this portion of Count One.

### 3. "Terminating Vision Bank's existence." (Doc. 130, ¶ 73.c).

SEPH relies on its argument concerning merger. (Doc. 106 at 13). Because SEPH is not entitled to summary judgment as to that portion of Count One, it is not entitled to summary judgment as to this portion of Count One, either.

### 4. "Refusing to provide [the plaintiff] with documentation it was entitled to pursuant to paragraphs 11 and 16 of the Participation Agreement." (Doc. 130, ¶ 73.d).

Section 11 of the Agreement provides in pertinent part as follows:

Originating Bank shall furnish to Participating Bank copies of the Loan Documents and all other documents and information Originating Bank may receive from time to time, whether pursuant to the Loan Documents or otherwise, relative to the Loan or the Borrower(s).

---

[6] In opposition to the plaintiff's motion for partial summary judgment, SEPH argued that Section 9.a of the Agreement requires the parties to eat their own losses on the Loan unless caused by Vision's negligence, willful misconduct or material breach of the Agreement, and it argued that the breaches on which the plaintiff based its motion were not material, such that the repurchase option of Section 13 was not triggered. (Doc. 133 at 11-19). SEPH's own motion for summary judgment does not argue that Section 9.a applies; indeed, its principal brief does not reference the provision at all. In its reply brief, SEPH does mention Section 9.a, but only to say that it precludes the repurchase option. (Doc. 153 at 4, 8). In short, no question concerning Section 9.a is before the Court on SEPH's motion for summary judgment.

(Doc. 130, Exhibit A at 6, § 11).[7]

 SEPH first argues that it was under no obligation to furnish the plaintiff any documents absent a request for them. (Doc. 106 at 14). Section 11 contains no "on request" language, and SEPH has not explained how the provision could be construed to include such a missing qualifier.

In a related vein, SEPH argues that, since the plaintiff did not request documents until after the Loan went into default, it could not have suffered damages from the failure to provide the documents earlier. (Doc. 106 at 14). But since SEPH apparently was obligated to provide the documents even absent a request, its timing argument falls apart. At any rate, there is evidence the plaintiff did request documents prior to default. (Baggett Deposition I at 65-68).

Finally, SEPH argues that the documentation "was not important or material to [the plaintiff]" because it had not been requested. (Doc. 106 at 14). As noted, the plaintiff did request documentation. Even if had not, however, SEPH has not shown that Section 11 limits the sharing of information and documents in this fashion. The language of Section 11 appears to provide for sharing of all documents and information in Vision's possession "relative to the Loan or the Borrower(s)," with no necessary threshold of materiality or significance.

As discussed below in Part II.A.6, Park downgraded the Loan in March 2008 and created a loan review report supporting its action. The plaintiff identifies this report as a document it should have received under Section 11 but did not. (Doc. 136 at 12). In its reply brief, SEPH argues that the plaintiff could not have suffered damage from this omission. (Doc. 153 at 8-9). This argument comes too late,[8] but it is in any event meritless.

---

[7] Neither party has specified what portion of the lengthy Section 16 might be in play. The plaintiff's opposition focuses exclusively on Section 11.

[8] "District courts, including this one, ordinarily do not consider arguments raised for the first time on reply." *Gross-Jones v. Mercy Medical*, 874 F. Supp. 2d 1319, 1330 n.8 (S.D. Ala. 2012) (citing cases and explaining the underlying rationale). SEPH

The plaintiff has evidence that, had it received the report and known of the downgrade, it also would have downgraded the Loan and would have urged Vision to take immediate action against Marine and its guarantors. (Baggett Affidavit, ¶ 6). SEPH scoffs that the Agreement reserves to Vision the exclusive right to administer the Loan, such that Vision could have ignored any request from the plaintiff. SEPH further complains that the plaintiff has not shown that any steps Vision might have taken would have resulted in the Loan being "fully" repaid. (Doc. 153 at 8-9).

As a reminder, SEPH's burden on motion for summary judgment is to negate damages or demonstrate, from the file, that the plaintiff cannot establish any damages. Sure, Vision could have ignored the plaintiff, but there is reason to think it would not do so. Beyond the adage that the customer is always right, Vision was contractually obligated to "exercise the same degree of care in administering" the plaintiff's participation interest as Vision "customarily exercises in handling similar loans for its own account," and Vision accepted legal liability for losses due to its lack of commercially reasonable conduct, negligence or willful misconduct. (Doc. 130, Exhibit A at 8-9, § 16.d). SEPH has not shown that Vision would have blown off the plaintiff, only that it could have done so, and possibility is not negation.

Similarly, it may be that nothing could have been done to keep the Loan from defaulting, but SEPH has not shown this to be a certainty. Instead, it has simply tried – improperly – to transform its burden of proving the lack of damages into a burden on the plaintiff to prove the existence of damages. That may work at trial, but it does not work on motion for summary judgment.

---

identifies no reason to depart from this well-established rule, and the Court declines to do so. Even if SEPH was unaware until receiving the plaintiff's brief in opposition that the plaintiff bases its claim in part on the loan review report, its ignorance would be due to its failure to nail down the plaintiff in discovery as to the reach of its contract claim. Summary judgment briefing is not a substitute for discovery, and the failure to complete discovery does not justify a departure from the rule against raising new arguments in a reply brief.

In summary, SEPH is not entitled to summary judgment as to this portion of Count One.

**5. "Failing to give [the plaintiff] prompt notice of default."** (Doc. 130, ¶ 73.e).

There is evidence that Bama Bayou had three loans with Vision totaling $16 million; that the principals and guarantors on the Bama Bayou loans were the same as those on the Marine loan; that, in May 2008, Vision notified Bama Bayou that the loans were in default due to the recording of a mortgage as to part of the property; and that Vision did not notify the plaintiff of this development. (Doc. 136 at 13; Plaintiff's Exhibit 50). The plaintiff argues that this information should have been disclosed pursuant to Section 10.

SEPH argues that default on the Bama Bayou loans could not have had a "material, adverse [e]ffect" on the Loan because the Loan's cross-default provision did not extend to those loans and because the Loan was secured by different collateral (a different parcel) than the Bama Bayou loans. (Doc. 106 at 15-16). The plaintiff responds that the identity of principals and guarantors indicates that default on the Bama Bayou loans could have a materially adverse effect on the Loan. (Doc. 136 at 13-14). SEPH replies only with the same limiting interpretations of Section 10 that it trotted out, unsuccessfully, in Part I.A.1.

In summary, SEPH is not entitled to summary judgment as to this portion of Count One.

**6. "Failing to give [the plaintiff] prompt written notice of a material downgrade of the Marine Park loan."** (Doc. 130, ¶ 73.f).

Section 4 of the Agreement provides in pertinent part as follows:

In the event Originating Bank decides to terminate its credit relationship with a Borrower, or materially downgrades its

17

> relationship with a Borrower, Originating Bank promptly
> will provide written notice of such determination to
> Participating Bank.

(Doc. 130, Exhibit A at 3, § 4).

There is evidence that Park grades loans on a scale of 1 to 8, with 1 the best, 8 the worst, and 4 the minimum passing grade; that, in March 2008, Park downgraded the Loan from 4 to 5;[9] that Vision never notified the plaintiff of this downgrade; that, on June 5, 2008, Park further downgraded the Loan from 5 to 6; and that Vision did not notify the plaintiff of this downgrade until August 21, 2008. (Doc. 118 at 9-10, ¶¶ 25-26, 28-29, 31; *id*. at 18).

SEPH first suggests that its notification of the second downgrade was timely under Section 4. (Doc. 106 at 16-17). But it provides the Court absolutely no basis for believing that an eleven-week gap constitutes prompt notice under the Agreement, and the Court cannot reach such an unlikely conclusion on its own.

SEPH's only other argument is the plaintiff suffered no damage due its breach of Section 4, on the grounds that, when it received notice in late August, the plaintiff did not immediately declare Vision to be in default and did not demand that the Loan be declared in default but did agree to extend the maturity date of the Loan. (Doc. 106 at 17-18). None of these circumstances negate damages or demonstrate the plaintiff cannot prove damages. This would be so even if the plaintiff had no explanation for its silence and its agreement to extend the Loan, but in fact the plaintiff has evidence that it so behaved because, when Vision finally advised the plaintiff of the (second) downgrade, it also told the plaintiff that the project was almost certain to receive Go Zone funding that would be adequate to complete the project but that an extension of the Loan was needed to allow this to play out. (Baggett Deposition I at 65-66, 349-50). With such an assurance, it would be more than reasonable for the plaintiff to agree to the extension (from September to December) and not to complain of Vision's breach

---

[9] SEPH accepts Park's downgrades as Vision's downgrades. (Doc. 106 at 16).

of Section 4.[10]  SEPH points out that the plaintiff understood the Go Zone funding to be merely "almost certain" to be approved, (Doc. 153 at 13-14), but most business decisions are made with less than absolute certainty about the future.

As discussed in Part II.A.4, the plaintiff asserts that, had it been timely advised of the March downgrade (before the Go Zone opportunity rose to prominence), it would have downgraded the Loan and would have urged Vision to take immediate action against Marine and its guarantors.  (Doc. 136 at 15-16). SEPH offers only the same response the Court rejected as inadequate in Part II.A.4.

In summary, SEPH is not entitled to summary judgment as to this portion of Count One.

### 7.  "Failing to give [the plaintiff] prompt notice of circumstances that had a material, adverse effect on the Loan or the value of the Collateral."  (Doc. 130, ¶ 73.g).

As might be expected, this portion of Count One focuses on alleged breaches of Section 10.  SEPH assumes that the only such alleged breaches are those addressed in Parts II.A.1 and 5.  (Doc. 106 at 18-19).  The plaintiff, however, points out that the allegation also includes Vision's failure to disclose personal business dealings between various Vision executives on the one hand and the Marine manager (and Bama Bayou developer) on the other ("Raley").  (Doc. 136 at 17-18).  In its reply brief, SEPH attempts to address these latter allegations but, for reasons given in note 8, *supra*, new arguments first raised in a reply brief will not support a motion for summary judgment.  Even if SEPH's tardy argument were addressed, it would not prevail.

---

[10] The same reasoning applies to the plaintiff's failure to demand that the Loan be declared in default.  Moreover, SEPH has not attempted to show that Vision's downgrade of the Loan constituted a default event under the Loan documents.

The plaintiff relies on the financial dealings of: (1) Daryl Melton, Vision's executive vice-president and the originator of the Loan; (2) Andrew Braswell, Vision's executive vice-president and senior lender, who handled the administration of the Loan; and (3) Daniel Sizemore, Vision's president. (Doc. 136 at 18-19; Doc. 106 at 7; Doc. 133 at 17). As to Melton, SEPH admits that "there is a question of fact as to whether there was any breach." (*Id*. at 18). As to Braswell and Sizemore, SEPH makes no argument that there was no breach, (Doc. 153 at 14-15), so the question remains open.[11]

As to all three Vision executives, SEPH argues only a lack of actual injury from the breach. The plaintiff has presented the affidavit of its executive vice-president, who testifies that, had the plaintiff known of Melton's dealings with Raley, it "would not have participated in the Marine Park loan." (Baggett Affidavit, ¶ 4). As SEPH recognizes, this evidence establishes a fact question as to damage, but SEPH insists the affidavit should be stricken as conclusory. (Doc. 133 at 18). SEPH's motion to strike the affidavit on this ground, (Doc. 132), has been denied by separate order. But even had the affidavit been stricken, SEPH would not thereby have met its burden of negating damage or showing that the plaintiff cannot prove damage, because striking a particular affidavit would not demonstrate that the plaintiff cannot present a more detailed explanation of why knowledge of Melton's dealings with Raley would have dissuaded it from entering the Agreement.

As to Braswell and Sizemore, SEPH objects only that the plaintiff in brief has not explicitly said it was damaged by their dealings with Raley. (Doc. 153 at 14-15). Until and unless SEPH meets its initial burden of negating such damage or pointing to materials on file that demonstrate the plaintiff cannot prove such

---

[11] SEPH denies that Braswell and Raley loaned money to each other. (Doc. 133 at 19 n.10). It does not, however, address Braswell's testimony that he entered a contract to purchase a condo associated with Raley and that he engaged in two unit flips with Raley. (Doc. 136 at 18; Braswell Deposition at 128-30; Braswell Trial Testimony at 156-57).

damage, the plaintiff has no obligation to address damage at all, and its silence does not compensate for SEPH's failure to meet its threshold burden.

In summary, SEPH is not entitled to summary judgment as to this portion of Count One.

### 8. "Failing to exercise the same duty of care towards the participating Loan as it has toward its nonparticipating loans." (Doc. 130, ¶ 73.h).

Section 16 of the Agreement provides in pertinent part as follows:

> Originating Bank agrees to exercise the same degree of care in administering Participating Bank's Participation Interest in the Loan that Originating Bank customarily exercises in handling similar loans for its own account; however, Originating Bank shall be liable to Participating Bank only for losses due to Originating Bank's lack of commercially reasonable conduct[,] negligence or willful misconduct.

(Doc. 130, Exhibit A at 8-9, § 16.d).

SEPH argues that Vision could not have violated this provision because it had a third-party inspector determine whether payment applications should be honored and paid only after receiving the inspector's recommendation for payment. (Doc. 106 at 19-21). SEPH further notes that its expert has opined that Vision "'followed commercially reasonable practices for an originating bank that was originating a loan that would be 100% participated out.'" (Doc. 106 at 21 (quoting Doc. 107, Exhibit O, ¶ 21)).

Problems abound. First, SEPH has not shown that this portion of Count One is limited to Vision's practices concerning payment applications, and the plaintiff's response criticizes many other aspects of Vision's conduct. (Doc. 136 at 19-21). Second, the plaintiff points out Park's own criticisms of Vision's practices, (*id*.), which the plaintiff ignores at its peril.[12] Third, SEPH's expert offers only an opinion that Vision's conduct was commercially reasonable for a

---

[12] SEPH did not address this portion of Count One in its reply brief.

bank that, thanks to a 100% participation, has no risk of loss on the loan, yet SEPH has not attempted to show that Section 16.d makes this low threshold sufficient to preclude liability.[13]

In summary, SEPH is not entitled to summary judgment as to this portion of Count One.

### 9. "Providing [the plaintiff] information and documents that were not true and accurate and omitting material facts."  (Doc. 130, ¶ 73.i).

Section 15 of the Agreement provides in pertinent part as follows:

<u>Representations and Warranties</u>.  Originating Bank hereby represents and warrants to Participating Bank that:
…
e.  To the best of its knowledge, after making reasonable inquiry, all information and documents delivered by Originating Bank to Participating Bank pertaining to the Loan, the Borrower(s), or the Collateral are true, accurate, and complete in all material respects and do not omit any material facts.

(Doc. 130, Exhibit A at 7-8, § 15.e).

There is evidence that Vision represented to the plaintiff before it entered the Agreement that the project cost was approximately $21.37 million (the approved budget).  There is also evidence that, in conjunction with closing the Loan, and shortly before the Agreement was entered, Vision received a payment application from the builder reflecting a project cost in excess of $27 million.  (Plaintiff's Exhibits 16, 24).  There is thus evidence that the lower figure presented

---

[13] It seems unlikely that Section 16.d would require Vision to perform with the same care it would employ as to loans in which it holds a 100% interest and simultaneously preclude liability so long as Vision performs with the same care a reasonable lender would employ as to loans in which it holds no interest at all.  More likely is that the final sentence of Section 16.d is intended to preclude liability only when Vision's customary standard of care as to loans for its own account exceeds what is commercially reasonable conduct by a lender as to loans for its own account.  The Court does not herein definitively construe the scope of Section 16.d but merely points out the inadequacy of SEPH's treatment.

to the plaintiff was inaccurate and omitted the material fact that the builder predicted a much higher project cost.

SEPH argues that Vision did not misrepresent the construction budget because the approved budget was the lower figure and the higher was but an unapproved figure in a payment application. (Doc. 106 at 21-22). As the plaintiff notes, (Doc. 136 at 22), SEPH's argument misses the point. The question is not whether the approved budget exceeded $21.37 million but whether the actual, projected cost of the project did so.

In its reply brief, SEPH floats additional arguments. (Doc. 153 at 9-11). Once again, these arguments are untimely raised and cannot support summary judgment. And once again, they would not change the result even if they were considered.

SEPH asserts that Braswell was unaware of the pay application until this summer because it was an attachment to an owner's/contractor's affidavit furnished by a title insurance company at closing. (Doc. 153 at 9). But Braswell was not the only Vision representative to attend closing, (Braswell Deposition at 44-45), and SEPH has not offered evidence that these other individuals also were unaware of the document. Even had it done so, SEPH has not explained how the failure to review a document presented at closing constitutes the "reasonable inquiry" required by Section 15.e.[14] Because the initial burden lies with SEPH, its familiar complaint that the plaintiff in its brief has not tried to show that Vision should have discovered the figure, (Doc. 153 at 10), is again unavailing.[15]

---

[14] Braswell admits that a Vision representative was charged with reviewing the closing package for completeness. (Braswell Deposition at 45). And the $27 million figure was not, as SEPH suggests, buried deep in another document but was prominently displayed on the front page of the owner's/contractor's affidavit executed by Raley. (Plaintiff's Exhibit 24 at 1).

[15] The plaintiff suggests the non-disclosure also violates Section 10. (Doc. 136 at 22 n.9). Because SEPH did not seek summary judgment based on Section 10, the Court will not consider the plaintiff's argument or SEPH's response to it. (Doc. 153 at 10-11).

The parties agree that this portion of Count One also challenges, under Section 15.e, Vision's failure to disclose the personal business dealings between its executives and Raley. (Doc. 106 at 22; Doc. 136 at 22). Both sides simply refer, without amplification or any argument tailored to the language of Section 15, to their previous discussion of those dealings and the non-disclosure of them in the context of Section 10 in Part II.A.7. Thus, SEPH has presented no potentially winning argument.

In summary, SEPH is not entitled to summary judgment as to this portion of Count One.

### 10. "Making loan advances to others for purposes other than construction of Marine Park." (Doc. 130 at 21, ¶ 73.j).

There is evidence that, at closing, Vision disbursed over $500,000 to pay off an outstanding loan to the builder for aquarium glass, which had to be paid up front because the glass was custom-made. There is also evidence, that a month later, Vision disbursed an additional $360,000 for aquarium glass. There is further evidence that Vision never confirmed that the half-million dollar disbursement was expended by the builder on the project. (Doc. 136 at 22-23; Braswell Deposition at 84-87; Flanagan Deposition at 49-52; Plaintiff's Exhibit 112).

SEPH asserts in a single sentence, without citing to the record or responding to the plaintiff's evidence and argument,[16] that the funds were expended on the project. (Doc. 106 at 22-23). That is patently insufficient to support summary judgment.

In summary, SEPH is not entitled to summary judgment as to this portion of Count One.

---

[16] SEPH did not in its reply brief address this portion of Count One.

**11. "Waiving or not enforcing or modifying or amending provisions of the Marine Park loan documents without the written agreement of [the plaintiff], including the Loan Agreement for Construction and Financing dated March 7, 2007."** (Doc. 130 at 21, ¶ 73.k).

Section 16 of the Agreement provides in pertinent part as follows:

Participating Bank shall, in all events be consulted and must consent, in writing, for Originating Bank to: (i) make or consent to any modification, amendment, or termination of any of the material terms or conditions of the Loan Documents ….

(Doc. 130, Exhibit A at 8, § 16.b).

SEPH argues that the Loan Documents gave Vision discretion to make the initial advance under the Loan without certain conditions being fulfilled, such that Vision could not have violated Section 16.b by making the initial advance without the plaintiff's written consent. (Doc. 106 at 23-24). The problem is that the plaintiff does not rely on irregularities in the initial advance but on the allegation that subsequent advances, including the final one, were made while certain conditions, which Vision had no discretion to ignore, remained unfulfilled. (Doc. 136 at 24-25). SEPH cannot obtain summary judgment without addressing the actual focus of the plaintiff's claim.

SEPH also argues that the plaintiff cannot base this claim on the extension of the Loan maturity date from September to December 2008, because the plaintiff orally agreed to the extension. (Doc. 106 at 23). Again, however, the plaintiff does not base its claim under Section 16.b on this event.

In summary, SEPH is not entitled to summary judgment as to this portion of Count One.

**12. "Failing to provide [the plaintiff] commercially reasonable documentation with each draw request."** (Doc. 130, ¶ 73.*l*).

Section 6 of the Agreement provides in pertinent part as follows:

Originating Bank shall provide to Participating Bank commercially reasonable documentation to support each advance.

(Doc. 130, Exhibit A at 4, § 6).

SEPH cites the testimony of a Vision employee for the proposition that Vision provided commercially reasonable documentation to support each advance. (Doc. 106 at 24-25). The plaintiff cites the testimony of its executive vice-president for the contrary proposition. (Doc. 136 at 25). SEPH, which ignores the plaintiff's response, has failed to show that the Court could or should rule in its favor despite the plaintiff's evidence.

In summary, SEPH is not entitled to summary judgment as to this portion of Count One.

### 13. "Refusing to repurchase [the plaintiff's] participation interest pursuant to the terms of the Participation Agreement." (Doc. 73 at 21, ¶ 73.m).

SEPH argues that it was not required to repurchase the plaintiff's participation interest because the repurchase provision is one for liquidated damages and, in the absence of any actual damage, a liquidated damages provision will not be enforced. (Doc. 106 at 25, 26-29). To demonstrate a lack of actual damage, SEPH relies on its previous discussion. (*Id*. at 27). As reflected above, SEPH's evidence and arguments are insufficient to demonstrate the absence of a genuine issue of material fact as to actual damages.

In its reply brief, SEPH introduces a new argument: that the non-recourse provisions of Sections 1 and 14 preclude the enforcement of Section 13. (Doc. 153 at 4-5). As discussed in Part I, this is a winning argument. However, because SEPH did not raise it until its reply brief, the Court cannot grant SEPH summary judgment on this ground. Nevertheless, because the Court has definitively resolved the issue adversely to the plaintiff, the plaintiff is precluded from pursuing relief under Section 13 in this case.

In summary, SEPH is not entitled to summary judgment as to this portion of Count One.

### B. Negligence.

Count Two alleges that the defendants failed to exercise reasonable care and diligence and failed to administer the Loan in a commercially reasonable manner. (Doc. 130 at 21, ¶ 77). SEPH argues in a single sentence that the opinion of its expert negates these allegations. (Doc. 106 at 25). As discussed in Part II.A.8, Park's own criticism of Vision's practices counters the expert's opinion and SEPH, by electing not to address the matter in its reply brief, leaves the Court unable to conclude that no fact issue remains.

SEPH also relies on its previous arguments for the proposition that the plaintiff can prove no damages from Vision's negligence. (Doc. 106 at 25-26). Those arguments fare no better in tort than in contract.

In summary, SEPH is not entitled to summary judgment as to Count Two.

### C. Willfulness.

Without elaboration, SEPH posits that the plaintiff "has no evidence that [Vision] acted with knowledge of danger or with consciousness that the doing or not doing of some act would likely result in injury." (Doc. 106 at 26). Glittering generalities do not negate wantonness or demonstrate that the plaintiff cannot prove the requisite mental state. Again, "[e]ven after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Clark,* 929 F.2d at 608.

In summary, SEPH is not entitled to summary judgment as to Count Three.

### D. Specific Performance.

Count Four seeks specific performance of Vision's repurchase obligation under Section 13. (Doc. 130 at 22). SEPH argues that the repurchase provision

should be construed so as to permit an award of liquidated damages but not specific performance and that the totality of the circumstances do not warrant specific performance in any event. (Doc. 106 at 26-27, 30).

For the proposition that the provision should not be construed as one permitting specific performance, SEPH relies on a single sentence from a law journal article, which did not mention the effect of an express provision for "an action for specific performance" to "enforce" the repurchase option and which cited for the proposition a single case, which likewise did not involve such an express provision for a specific performance remedy. SEPH has failed to show that Section 13 should be read as precluding the specific performance remedy it explicitly provides.

For the proposition that specific performance, if permitted, should not be required, SEPH notes only in one brief paragraph that the decision whether to order specific performance is within the discretion of the Court; that the Court should consider all the circumstances; and that the relevant circumstances are the expert's opinion and the plaintiff's lack of actual damage. (Doc. 106 at 29). As noted repeatedly in Part II.A, SEPH has failed to carry its initial burden of showing a lack of actual damage. And as noted in Part II.A.8, the expert's opinion is undercut by Park's criticisms of Vision's practices. SEPH's cursory treatment is inadequate to rule out a specific performance remedy. In its reply brief, SEPH seeks to expand the circumstances the Court should consider. (Doc. 153 at 6-7). Again, SEPH has waited too long to raise these arguments.

However, and as stated in Part II.A.13, because the Court has definitively ruled in Part I that Sections 1 and 14 eliminate the repurchase option, the plaintiff is precluded from pursuing relief under Section 13 in this case.

## CONCLUSION

For the reasons set forth above, the plaintiff's motion for partial summary judgment and SEPH's motion for summary judgment are both **denied**.

DONE and ORDERED this 27th day of December, 2013.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE